**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

|  |  |
|---|---|
| RICHARD CARTER,<br><br>                 Plaintiff,<br><br>         v.<br><br>PSEG SERVICES CORPORATION,<br><br>                 Defendant. | HONORABLE KAREN M. WILLIAMS<br><br>Civil Action<br><br>No. 20-15573 (KMW-EAP)<br><br>**OPINION** |

**Richard Carter,** *pro se*
1 Market Street
Apt. 229
Camden, NJ 08102

**Phillip Coursey Bauknight, Esq.**
Fisher & Phillips LLP
430 Mountain Avenue
Suite 303
Murray Hill, NJ 07974
*Counsel for Defendant PSEG Services Corporation*

**WILLIAMS, District Judge:**

## I.   INTRODUCTION

*Pro Se* Plaintiff Richard Carter ("Plaintiff"), an African American man, brings this action against his former employer, PSEG Services Corporation ("Defendant") alleging that he was subjected to a racially hostile working environment, racial discrimination, and retaliation after filing a charge of racial discrimination with the Equal Employment Opportunity Commission

("EEOC")[1] in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e, et seq.[2]

Presently before the Court are Defendant's Motion for Summary Judgment ("MSJ") filed pursuant to Federal Rule of Civil Procedure 56 and Plaintiff's Motion to Dismiss[3] ("MTD"). Plaintiff has opposed the MSJ and Defendant has opposed the MTD.[4]  On February 21, 2024, the Court held oral argument on these motions.

---

[1] As explained later in this opinion, on October 10, 2013, Plaintiff filed a verified complaint with the New Jersey Division of Civil Rights, which conducted an investigation and issued a decision that was subsequently adopted by the EEOC.

[2] The Court notes the Honorable Robert B. Kugler, U.S.D.J. dismissed Plaintiff's claim alleging retaliation that was filed before Plaintiff filed his EEOC charge. (See ECF Nos. 21, 22)

[3] By way of clarification, Plaintiff's MTD does not appear to be a request to dismiss the instant action. Rather, it is a request, in part, to take a deposition of Defendant for "the discovery of facts and evidence . . . to support Plaintiff's case." (ECF No. 181 at 2) Plaintiff further requests that the instant action be tried before a jury. *Id.* Plaintiff appears to file his Motion pursuant to Fed. R. Civ. P. 56(d) which states, in pertinent part, "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Throughout the course of this litigation, requests to extend discovery deadlines were granted four times by the Court. (*See* ECF Nos. 63, 69, 71, 126) However, Plaintiff, failed to comply with the Court's orders directing him to identify the specific discovery he needed to support his claims. (*See* ECF Nos. 142, 153, 158, 165) Accordingly, Plaintiff's attempt to reopen discovery at this stage in the litigation, by way of the instant MTD, is denied.

[4] The Court notes that Plaintiff sought an extension to file an opposition to Defendant's MSJ, which this Court granted. (ECF No. 168) Thereafter, Plaintiff timely filed his opposition, to which Defendant filed a reply. (ECF Nos. 171, 174) Almost a month later, Plaintiff filed what appears to be an amended opposition to Defendant's MSJ. (ECF No. 179) Local Civil Rule 7.1(d)(2) states "[t]he brief and papers in opposition to a motion . . . must be filed with the Clerk at least 14 days prior to the original motion day, unless the Court otherwise orders . . . ." The Rule further states the Court "may reject any brief or other paper not filed within the time specified." L. Civ. R. 7.1(d)(7). Here, Plaintiff has not complied with the Local Rules as he did not file the papers submitted in connection with his amended opposition by the extension deadline set by the Court. While the Court affords certain procedural flexibilities to *pro se* litigants, there are limits to that flexibility. *See Mala v. Crown Bay Marina, Inc*., 704 F.3d 239, 245 (3d Cir. 2013). *Pro se* litigants "cannot flout procedural rules – they must abide by the same rules that apply to all other litigants," including compliance with all Local and Federal Rules of Civil Procedure. *Id.*; *Barrentine v. N.J. Transit*, No. 12-3936, 2013 WL 4606781, at *6 (D.N.J. Aug. 28, 2013). Accordingly, in addressing the instant motion, the Court will consider the opposition papers Plaintiff submitted by the deadline set by this Court. (ECF No. 171) The Court will not consider Plaintiff's amended opposition to Defendant's MSJ. (ECF No. 179)

## II.   BACKGROUND[5]

Plaintiff, an African American man, was employed by Defendant as a utility mechanic for nearly twelve years until his termination on December 10, 2014. Defendant's Statement of Material Facts ("Def's SMF") ¶¶ 1, 22. Defendant documented multiple incidents of Plaintiff's conduct between August 2013 and October 2014, which culminated in his termination. *Id*. ¶¶ 37-92. During this time period, Plaintiff also filed a complaint for discrimination against Defendant with the New Jersey Division of Civil Rights (the "NJDCR"). (ECF No. 21 at 2)

The first documented incident of Plaintiff's misconduct occurred on August 23, 2013, when Plaintiff arrived 18 minutes late to work. Def's SMF ¶ 37. That same day, Plaintiff's supervisor, James Venito ("Venito"), informed Plaintiff that his name had come up for random blood testing and directed Plaintiff to have the testing completed. *Id*. ¶ 38. Plaintiff failed to follow instructions to complete the blood test and, as a result, was given an "Oral Reminder," Defendant's first step of formal discipline. *Id*. ¶¶ 39-41.

---

[5] Pursuant to Local Civil Rule 56.1, a movant on a motion for summary judgment "shall furnish a statement which sets forth material facts as to which there does not exist a genuine issue, in separately numbered paragraphs citing to the affidavits and other documents submitted in support of the motion." In turn, the opponent of summary judgment "shall furnish, with its opposition papers, a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion." *Id*. Here, Defendant has submitted a statement of material facts with the MSJ. (ECF No. 166-28) However, Plaintiff has not offered a response to that statement. Instead, Plaintiff, in his opposition to Defendant's MSJ, seeks to reopen discovery, arguing that further evidence is needed to support his claims. (ECF No. 171 at 1) Plaintiff also provides narratives related to certain facts and evidence (ECF No. 171 at 4-5), which he believes sufficiently precludes summary judgment, but does not provide citations to the record evidence. *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record[.]"). For these reasons, Defendant's statement of material facts is deemed undisputed for purposes of the summary judgment motion. *See* L. Civ. R. 56.1.

On October 10, 2013, Plaintiff filed a "Verified Complaint" for discrimination against Defendant with the NJDCR, in which he asserted that his supervisor 1) issued him a written warning for being late; 2) issued a written warning for failing to follow directions; 3) placed him on probation; 4) mandated that he take a drug test; and 5) mandate that he be medically examined.[6] (ECF No. 21 at 2) Plaintiff also alleged that his Caucasian co-workers engaged in similar conduct yet Defendant did not subject them to discipline. *Id*. at 2-3. As part of the complaint process, the NJDCR interviewed Plaintiff and on its interview form checked boxes for "differential treatment," as his allegation and "race," and "handicap" as the basis of discrimination. *Id*. at 2; ECF No. 9-1. After Plaintiff filed his complaint, the NJDCR began an investigation into Plaintiff's allegations. (ECF No. 21 at 3)

The second incident of misconduct documented by Defendant occurred approximately five months later, on January 28, 2014. Def's SMF ¶ 46. Plaintiff did not follow instructions given to him to install an Adams clamp[7] (the "Adams clamp incident") by a leader at a job site and was subsequently issued a "1st Level Written Reminder," Defendant's second step of formal discipline. *Id*. ¶¶ 46-47. The reminder was given in the form of a letter dated February 10, 2014, which summarized Plaintiff's misconduct to date and warned Plaintiff additional work-related issues could result in further disciplinary action, including discharge. The letter stated, in pertinent part:

---

[6] Plaintiff filed his October 2013 complaint with the NJDCR in response to several incidents which appear to overlap with incidents Plaintiff identified in his depositions and which are described later in this opinion, including the posting of "offensive" materials in the employee locker room, supervisors and co-employees "speaking in a racially insensitive way" and "directing racially understood slurs and epithets" towards Plaintiff, Plaintiff being transferred from his job as a utility mechanic to a janitorial position, and Plaintiff's suspension from his job without pay following a "workplace altercation with a co-employee in which Plaintiff caused a co-employee to be knocked off a vehicle." (ECF No. 21 at 1-2)

[7] The record does not clearly define an "Adams clamp," however, from the context of how it is described, it appears to be a tool or device Plaintiff used in the course of his employment with Defendant.

On August 27, 2013, you received an Oral Reminder for your unacceptable conduct for failure to follow instructions.

Most recently, on January 28, 2014, while working at Witherspoon Ave. and Woodland Ave[.], Pennsauken, you failed to install an Adams clamp as directed. As such, you are being issued a 1st Level Written Reminder for unacceptable conduct. This is the second step of formal discipline and will remain active for a period of 15 months.

Any future issues in the areas of Conduct, Work Performance, or Availability, during the 15 month active period of your discipline will in all likelihood lead to further disciplinary action up to and including discharge.

*Id*. ¶ 47. Approximately four months later, in June 2014, Plaintiff received "[c]oaching/[c]ounseling" for failure to follow directions and notify supervision that he did not have certain equipment while at a job site. *Id*. ¶¶ 48-49.

The third documented incident of misconduct occurred on August 28, 2014.[8] *Id*. ¶ 51; Declaration of Phillip C. Bauknight ("Bauknight Decl.") ¶ 18 at Ex. P. James Jantzi ("Jantzi"), a jobsite leader, complained that while Plaintiff was working he "was disrupting the crew, would not listen to him [Jantzi]," made "inappropriate comments regarding [Jantzi's] medical history," and referred to Jantzi and another employee "as being drug addicts." Def's SMF ¶ 51. After Plaintiff was instructed not to return to Jantzi's job site, he returned anyway on that same day and "drove in a Company vehicle on Company time" past the job site. *Id*. ¶¶ 55-56. Following these events, Plaintiff had a meeting with a manager and was given a "Second Level Written Reminder," Defendant's third step of formal discipline, in the form of a letter dated September 11, 2014. *Id*. ¶¶ 57-61. The letter summarized Plaintiff's previous misconduct and again warned Plaintiff that additional work-related issues could result in further disciplinary action, including discharge. The September 2014 letter stated the following:

---

[8] The Court notes Defendant's Statement of Material Facts lists "October 28, 2014" as the date of this incident, but in reviewing the record, it appears this date is a typographical error, and the correct date of the incident is August 28, 2014. *See* Bauknight Decl. ¶ 18 at Ex. P.

This letter confirms our meeting on September 11, 2014 at which time we discussed your recent conduct.

Specifically, on August 27, 2013, you were issued an Oral Reminder for failing to follow instructions. Then, on February 10, 2014, you were issued a First Level Written Reminder, again for failing to follow instructions. In addition, you have been coached and counseled twice since receiving the First Level Written Reminder, on June 10, 2014 and June 20, 2014, the latter time for again not following instructions.

Despite these repeated instructions and warnings, on August 28, 2014, you drove in a Company vehicle on Company time [past] a job site at which you had an issue with a co-worker earlier that day, despite being instructed by supervision not to return there and despite the fact that there was no work-related reason for you to do so.

[A]s a result of your actions, you are being issued this Second Level Written Reminder which will remain active for a period of 18 months. In addition, as a result of your continued failure to follow instructions, you will be precluded for the 18-month duration of this discipline from all assignments that may require you to work independently.

[I]f any future problems arise in any of the performance categories – availability, conduct or work performance – during the active period of this Second Level Written Reminder, you may be subject to further discipline, up to and including discharge.

*Id.* ¶¶ 56-61 (second alteration in original).

The fourth documented incident of misconduct occurred on October 7, 2014. *Id.* ¶ 62. Plaintiff was working with co-worker Richard Gill ("Gill") and jobsite leader James Hyder ("Hyder"), who later expressed they felt "uncomfortable" because they believed Plaintiff was recording their conversations on his cell phone. *Id.* ¶¶ 62-63. During the encounter, Plaintiff said to Hyder that he needed to "ask . . . a few questions . . . about [the Adams clamp] incident." Def's SMF ¶ 64. When Hyder expressed he did not wish to speak about the incident, Plaintiff attempted to speak about the incident at least five more times and eventually asked Hyder "are you working with Venito against me?" *Id.* ¶¶ 65-69.

Gill and Hyder later had meetings with Venito to discuss interactions they had with Plaintiff on October 7. *Id.* ¶¶ 70, 74. During his meeting with Venito, Gill described a separate incident with Plaintiff that occurred on October 7 but had not been previously reported. *Id.* ¶¶ 77-78. Gill shared that Plaintiff "punched me in the right shoulder when I had my back to [Plaintiff].

In my opinion[,] it was way too hard to just be a friendly gesture or messing around." *Id*. ¶ 78. Gill said he told Plaintiff to stop and a few minutes later Plaintiff "grabbed [Gill] by the vest and ripped [Gill] off the truck very violently." *Id*. Gill stated he told Plaintiff "if he ever F___ touch me again, I will lay you the f___ out." *Id*. Gill stated he "tried to defuse the situation by walking away" but Plaintiff returned with his phone and asked Gill whether he knew Plaintiff was "messing" when Plaintiff "tapped" him and "tugged" on his vest. Def's SMF ¶ 78. Gill replied, "no Rich, you punched me and ripped me off the running board of the truck." *Id*. Plaintiff denied Gill's recall of the incident, stating "no Rich Gill that's not what happened, I tapped you and when I pulled you off the truck I was just playing." *Id*.

Following the interview with Gill, Venito reported the allegation of physical contact to a district manager and additional meetings were conducted with Hyder and Plaintiff to determine what happened on October 7. *Id*. ¶ 79. During his second meeting about the October 7 incident, Hyder admitted he did not see Plaintiff punch Gill but saw Gill's vest was "tugged" and saw Gill "stumble back." *Id*. ¶¶ 81-82. Plaintiff denied having a verbal altercation and physical contact with Gill.[9] *Id*. ¶ 86.

Defendant's investigation report of the October 7 incident concluded that "the allegations were substantiated and [Plaintiff] was immediately suspended pending further discussion." Def's SMF ¶ 88. In Defendant's report summarizing the investigation, a recommendation was made to "discharge" Plaintiff "[d]ue to the conclusion that [Plaintiff] made unwanted physical contact with [Gill] on 10/7/2014 and the level of discipline that [Plaintiff] is now on." *Id*. ¶ 89.

---

[9] During the course of this litigation, Plaintiff was deposed and admitted he "tapped" Gill on the leg to warn Gill not to step on Plaintiff as he stepped down from the truck. Def's SMF ¶ 87.

Following an internal review, Plaintiff was terminated by letter dated December 10, 2014.

*Id*. ¶ 90. The letter summarized the incidents that occurred between August 2013 and October

2014, stating the following:

> On August 27, 2013, you were issued an Oral Reminder for failing to follow instructions. On February 10, 2014, you were issued a [F]irst Level Written Reminder because you did not properly install an Adams clamp on a gas main. On September 11, 2014, you were issued a Second Level Written Reminder, again for failing to follow instructions. Each time, you were advised that if any problems arose in your conduct, work performance or availability during the active period of the corrective action, you would be subject to further discipline, up to and including discharge.
>
> Despite these repeated warnings, on October 7, 2014, you punched a co-worker and aggressively pulled him off a company vehicle for no legitimate reason. To ma[k]e matters worse, you were not candid in the related investigation. This incident is the latest in a series of incidents which demonstrate that you either refuse or are unable to conduct yourself properly when in the presence of your co-workers.
>
> The Company is committed to maintaining a workplace free of physical altercations, threats, and intimidation. Your actions on October 7th seriously impeded the Company's ability to maintain such a workplace. Your employment is terminated effective immediately as a result of your aforementioned actions, your active positive discipline record, and the Company's conclusion that your continued employment would pose a safety risk for its employees and otherwise impact its ability to run an efficient operation.

*Id*. ¶ 91. Thereafter, Plaintiff filed a grievance related to his termination which was rejected after

the union determined that Plaintiff's "chance of prevailing at arbitration . . . [was] minimal."[10] *Id*.

¶ 92.

Pursuant to Plaintiff's October 2013 complaint, the NJDCR investigated and issued a

decision in December 2019. (ECF No. 21 at 3) The NJDCR concluded that its "investigation did

not find sufficient evidence to support a reasonable suspicion that [Defendant] discriminated

against [Plaintiff] based on his race or disability[.]" *Id*. (third alteration in original). On August 7,

---

[10] The Court notes that Plaintiff was a member of "The Public Utility Construction and Gas Appliance Workers of the State of New Jersey United Association Local Union 855" in connection with his employment with Defendant. *See* Bauknight Decl. ¶ 26 at Ex. X. It is Plaintiff's membership in the union that entitled him to Defendant's progressive level of discipline prior to his termination.

2020, the EEOC issued a Right to Sue Notice, which indicated that it had "adopted the findings of the state['s] local fair employment practices agency that investigated th[e] charge." *Id*. (second alteration in original).

On November 5, 2020, Plaintiff brought this action against Defendant. (ECF No. 1) After Plaintiff filed the Amended Complaint, Defendant moved to dismiss, in part, Plaintiff's complaint, including dismissal of Plaintiff's retaliation claim for opposition to racial discrimination pre-EEOC charge. (ECF No. 11) Judge Kugler granted the dismissal of this claim, finding that Plaintiff had not properly exhausted his administrative remedies. (ECF Nos. 21, 22) Thus, the remaining claims against Defendant are: 1) racially hostile work environment, 2) racial discrimination, and 3) retaliation for opposition to racial discrimination post-EEOC charge. *See* Amended Compl. 1-17, ECF Nos. 9, 22.

During the course of this litigation, Plaintiff was deposed on December 22, 2022, and May 16, 2023, and testified that certain events transpired which he believed were "retaliation" against him from an incident that occurred at a job site in October 2012. Def's SMF ¶¶ 2-6. Plaintiff testified that in October 2012, while working at a job site with co-worker Boz Fennimore ("Fennimore"), Fennimore asked Plaintiff to air test the gas service on a gas main. *Id*. ¶¶ 2-3. When Plaintiff refused and explained that mixing the gas and air could cause an explosion, a supervisor was contacted who determined Plaintiff was correct and Fennimore was wrong. *Id*. ¶¶ 4-5. (the "Fennimore incident").  Plaintiff testified that following the Fennimore incident, he was assigned

temporary janitorial duties,[11] was directed to take at least two unscheduled drug tests,[12] and was ordered to undergo a fitness for duty examination.[13] *Id*. ¶¶ 6-8, 12-14, 18.

When Plaintiff was asked during his deposition what discriminatory actions were taken against him or whether he believed any particular adverse action was based on his race, Plaintiff sometimes answered "yes" but repeatedly referenced the Fennimore incident as the reason he believed to be the underlying motivation for the actions taken against him. *Id*. ¶ 23. Plaintiff also identified instances in which he felt he was discriminated against, including: 1) being temporarily assigned from utility mechanic to janitor when he "hadn't done anything [wrong]" and 2) being treated differently compared to other co-workers when, for example, Plaintiff "did something wrong" or when Plaintiff corrected someone else. Bauknight Decl. ¶ 6 at Ex. D at 10:9-11:3. Plaintiff testified about an incident where a Caucasian employee, Dave Meyers ("Meyers"), drove a "truck with CO2 and oxygen tanks" without being licensed and the incident was "[kept] . . . under the table, [the incident was kept] covered."[14] *Id*. at 65:9-22, 66:11-21. Plaintiff also testified about another employee, Johnnie Horvath ("Horvath"), who put a hole in a gas line, but this

---

[11] Plaintiff was temporarily assigned janitorial duties "on a few occasions in 2013" after safety complaints were reported to management regarding Plaintiff's work behavior, including Plaintiff acting "confrontational," not performing his job as instructed by his superiors, and questioning directives given to him. Def's SMF ¶¶ 7, 9-10. Plaintiff was "temporarily reassigned" until the safety complaints were investigated and subsequently returned to his normal work assignments following the investigations. *Id*. ¶ 11.

[12] In August 2013, Plaintiff's name came up for random drug testing and he was accordingly instructed to report for the testing. Def's SMF ¶ 15. It does not appear that Plaintiff was randomly drug tested a second time.

[13] In September 2013, Plaintiff was ordered to undergo a fitness for duty examination to determine whether there were illegal substances or alcohol present in his system. Def's SMF ¶ 16. Plaintiff was directed to undergo a fitness for duty examination following behavior that had been observed by a supervisor, including "[d]isregard for the safety of others," "[i]nconsistency in quality of work," "[d]ifficulty in remembering own mistakes," "[i]ncreased difficulty in handling complex situations," and "overreaction to real or imagined criticism." *Id*. ¶¶ 19-20. A confrontation with a co-worker was the final event that resulted in Plaintiff being ordered to undergo the fitness for duty examination. *Id*. ¶ 21.

[14] Based on Plaintiff's testimony, and in reviewing the evidence in the light most favorable to Plaintiff, the Court gleans that Meyers was not disciplined for this incident.

incident was "kept . . . quiet" and not reported to the police or the fire department as it should have been. *Id*. at 66:22-67:9.

Plaintiff testified about additional incidents which appear to be in support of his racially hostile work environment claim. Def's SMF ¶¶ 28, 32, 34. Plaintiff explained that while working with Fennimore at a job site, Fennimore said to Plaintiff that the "only thing he (Fennimore) wanted Plaintiff to do was to use the shovel."[15] *Id*. ¶¶ 24-27. In connection with the "shovel" remark, Plaintiff testified during his deposition that he believed this comment was discriminatory based on his race:

> Q:     So you believe being told to use a shovel and those issues were discriminatory based on your race?
>
> A:     It's not just a belief. Why are you treating me differently overall? Why you writing me up? . . . Is this hostile work environment? Is this retaliation because I reported [Fennimore]? Is it being vindictive? What else do you want to consider it?

*Id*. ¶ 28. Plaintiff believed he reported the "shovel" comment to a management-level employee but could not recall to whom. Bauknight Decl. ¶ 6 at Ex. D at 42:7-17. Finally, Plaintiff also testified about observing "offensive posters, [caricatures], postings, and [an] over-size black penis" in the the employee locker room, but admitted that after submitting a complaint to Defendant's human resources department, these items were taken down and were not put back up.[16] Bauknight Decl. ¶ 4 at Ex. B at 190:14-193:2; Amended Compl. ¶ 15. Plaintiff submitted a photograph which he purports to show the "offensive" materials. (ECF No. 171-1) Plaintiff further testified he was told

---

[15] The Amended Complaint indicates the "shovel" remark occurred on January 18, 2013. Def's SMF ¶¶ 24-27.

[16] The Amended Complaint indicates Plaintiff reported these offensive materials to Defendant's human resources department on July 15, 2013. Def's SMF ¶ 30.

"Get in your own truck, boy" by Rick Cassel, a co-worker, while at a job site.[17] Def's SMF ¶ 33. After Plaintiff reported this incident, Defendant conducted an investigation, interviewing several employees, including Cassel, but was ultimately "unable to substantiate [Plaintiff's] allegation. Cassel denied the allegation, there were no witnesses or other objective evidence to corroborate that [Cassel] made the alleged statement." *Id*. ¶¶ 34, 36.

## III.    STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also M.S. by & through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) ("A fact is material if – taken as true – it would affect the outcome of the case under governing law."). "A dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Santini*, 795 F.3d at 416 (quoting *Anderson*, 477 U.S. at 248).

In considering a summary judgment motion, the district court "may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed[,] and all justifiable inferences are to be drawn in his [or her] favor.'" *Montone v. City of Jersey City*, 709 F.3d 181, 191 (3d Cir. 2013) (first alteration in original) (quoting *Marino v. Indus. Crafting Co.*, 358 F.3d 241, 247 (3d Cir. 2004)). The moving party has the initial burden of showing the basis for its motion and must demonstrate that there is an absence

---

[17] The Amended Complaint indicates the "boy" comment was directed to Plaintiff on or about January 24, 2014. Def's SMF ¶ 33.

of a genuine issue of material fact by citing to record evidence, including depositions, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c)(1)(A). After the moving party adequately supports its motion, the burden shifts to the nonmoving party "to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Santini*, 795 F.3d at 416 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations omitted)).

While the nonmoving party is entitled to the benefit of all justifiable inferences from the evidence, it "may not, in the face of a showing of a lack of a genuine issue, withstand summary judgment by resting on mere allegations or denials in the pleadings." *United States v. Premises Known as 717 S. Woodward St., Allentown, Pa.*, 2 F.3d 529, 533 (3d Cir. 1993). To survive a motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. *Anderson*, 477 U.S. at 256-57. Failure by the nonmoving party "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" entitles the moving party to "judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 322-23.

## IV.   DISCUSSION

Defendant has moved for summary judgment with respect to all of Plaintiff's remaining claims. The Court addresses each claim in turn.

### 1.   Hostile Work Environment

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of

such individual's race." 42 U.S.C. § 2000e-2(a)(1). Title VII is not limited to "economic" or "tangible" discrimination as it "also bars a discriminatorily hostile or abusive [work] environment." *In re Tribune Media Co.*, 902 F.3d 384, 399 (3d Cir. 2018) (alteration in original) (first quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986); then quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). The inquiry into whether an environment is hostile or abusive requires consideration of "the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Nitkin v. Main Line Health*, 67 F.4th 565, 570 (3d Cir. 2023) (quoting *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 168 (3d Cir. 2013)). To prevail on a hostile work environment claim under Title VII against an employer, a plaintiff must establish "1) [he or she] suffered intentional discrimination because of his/her [race], 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability." *In re Tribune*, 902 F.3d at 399 (second alteration in original). "The first four elements establish a hostile work environment, and the fifth element determines employer liability." *Mandel*, 706 F.3d at 167. When determining whether the elements of a hostile work environment claim are established, the Court must evaluate the record "as a whole . . . [focusing] not on individual incidents, but on the overall scenario." *Cardenas v. Massey*, 269 F.3d 251, 261 (3d Cir. 2001).

"For discrimination to constitute severe or pervasive behavior, it must 'alter the conditions of [the victim's] employment and create an abusive working environment." *Nitkin*, 67 F.4th at 570 (alteration in original) (quoting *Meritor Sav. Bank, FSB*, 477 U.S. at 67). The "'conduct must be

extreme' to satisfy this standard, so 'simple teasing, offhand comments, and isolated incidents (unless extremely serious)' are inadequate," *id*. (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)), and do not amount to "discriminatory changes in the terms and conditions of employment." *Greer v. Mondelez Global, Inc.*, 590 F. App'x 170, 173 (3d Cir. 2014). Mere offensive utterances "are insufficient to create a hostile environment, even if they engender offensive feelings in an employee." *Id*.; *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001)). "The conduct must be more than 'merely offensive,' but need not be so severe as to cause 'a tangible psychological injury.'" *Hurley v. Atl. City Police Dep't*, 933 F. Supp. 396, 407 (D.N.J. 1996) (quoting *Harris*, 510 U.S. at 20-22).

As to the fifth element under the hostile work environment framework, an employer may be strictly liable under *respondeat superior* liability for a supervisor's or co-worker's discriminatory acts. *In re Tribune*, 902 F.3d at 399. An employer is strictly liable for a supervisor's actions "[i]f the supervisor's harassment culminates in a tangible employment action," which the Supreme Court has defined as a "significant change in employment status, such as hiring, firing, failing to promote, reassign[ing] with significantly different responsibilities, or a decision causing a significant change in benefits." *Id*. (alterations in original) (first quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013); then quoting *Burlington Indus., Inc., v. Ellerth*, 524 U.S. 742, 761 (1998)). On the other hand, "'[w]hen the hostile work environment is created by . . . non-supervisory co[-]workers,' employers are 'not automatically liable' in all instances." *Id*. (first alteration in original) (quoting *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009)). Employer liability exists if "the employer failed to provide a reasonable avenue for complaint or . . . the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." *Id*. (quoting *Huston*, 568 F.3d at 104).

In support of his hostile work environment claim, Plaintiff points to three particular events which he asserts are racist in nature and offensive – Fenimore's "use the shovel" statement, posters displayed in the employee locker room, and Cassel calling him "boy".  To this end, in support of his claim that Fennimore's "use the shovel" remark is racist, Plaintiff relies solely on his "belief" that it was racially motivated.  As to the materials posted in the employee locker room, Plaintiff submitted a photograph of two posters and what appears to be some sort of effigy depicting male genitalia affixed to the door of a locker, displayed beneath an issue of Time magazine with former Governor Chris Christie featured on the cover.[18] (ECF No. 171-1).

In viewing the evidence in the light most favorable to Plaintiff, there is some evidence in the record to suggest that Plaintiff may have been subjected to unfavorable remarks (albeit not overtly racial) and exposed to an offensive image displayed in the employee locker room. Based on that evidence, the Court must next address whether Plaintiff has established the remaining elements of a hostile work environment claim.[19] Crucially, Plaintiff must be able to show that the two separate remarks made to him and the materials displayed in the employee locker room were "severe or pervasive" to the extent that a hostile work environment was created. Here, Plaintiff has not demonstrated that the remarks made by co-workers Fennimore and Cassel and the materials displayed in the employee locker room constitute "severe or pervasive" conduct as that phrase is defined.  Indeed, the two comments directed towards Plaintiff by his co-workers – "use the shovel"

---

[18] The photograph provided by Plaintiff displays two posters on a locker door. One poster reads, "Surf Taco: Coastal Cuisine." (ECF No. 171-1) A second photo depicts Time magazine with then-New Jersey Governor Chris Christie on the cover with the words "The Boss.", beneath the cover is what appears to be an object molded in the shape of male genitalia formed out of what is ostensibly blackened clay-like material. (ECF No. 171-1) Bauknight Decl. ¶ 4 at Ex. B at 205:19-206:1.

[19] As discussed above, the elements of a hostile work environment claim are: 1) plaintiff suffered intentional discrimination because of his race, 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected Plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability. *See In re Tribune*, 902 F.3d at 399.

and "boy" – and the offensive materials posted in the locker room, which were taken down and not posted again, simply do not rise to the level of "severe or pervasive" conduct. While it is axiomatic that referring to an African American man as "boy" is akin to a racial slur, the record reveals that this was a single isolated incident. Moreover, it is unclear to the Court how "use the shovel" implicates any sort of racial animus. Thus, the Court can not find that the "isolated" locker room incident and "offhand" comments were severe, threatening, or humiliating conduct that could conceivably form the basis of a hostile work environment claim, s*ee Greer*, 590 F. App'x at 174. Notably, the identified conduct occurred over the course of eighteen (18) months and approximately six months apart from each other.[20] *Nitkin*, 67 F.4th at 571. Next, even assuming that these events are objectively hostile, Plaintiff has not shown that they altered the "terms and conditions" of his employment or demonstrated that they rendered the workplace into an environment "permeated with discriminatory intimidation, ridicule, and insult." *See Greer*, 590 F. App'x at 174 (first quoting *Breeden*, 532 U.S. at 270; then quoting *Harris*, 510 U.S. at 21).

What is more, the events identified by Plaintiff are a far cry from incidents courts have held create a genuine issue of material fact on a hostile work environment claim. For instance, in *Aman v. Cort Furniture Rental Corp.*, the Third Circuit found black former employees presented sufficient evidence demonstrating they were subjected to "inherently racist remarks" for approximately six years while other black employees were harassed on a daily basis, precluding summary judgment on a hostile work environment claim. 85 F.3d 1074, 1082 (3d Cir. 1996). Similarly, in *Hightower v. Roman, Inc.*, another Court in this District held allegations of numerous derogatory racial epithets directed to African American former employees on a daily basis, in

---

[20] As stated above, Plaintiff alleges the "use the shovel" remark occurred on January 18, 2013, Plaintiff reported the "offensive" materials to Defendant's human resources department on July 15, 2013, and Plaintiff alleges the "boy" comment occurred on or about January 24, 2014. *See supra* n. 8, 9, 10.

addition to racial comments and jokes made by supervisors and other employees, were sufficient to survive summary judgment on a hostile work environment claim. 190 F. Supp. 2d 740, 750-51 (D.N.J. 2002).

Unlike the former employees in *Aman* and *Hightower*, the incidents Plaintiff complains of here are neither "severe" nor did they occur with such frequency that a reasonable jury could find that Plaintiff was exposed to a hostile work environment. In fact, the Third Circuit has affirmed at least one other district court's grant of summary judgment on a hostile work environment claim where unprofessional "mere offensive utterances," including racially themed comments, were directed to an employee and sexually suggestive imagery had been posted in an employee common area. *See Greer*, 590 F. App'x at 172-173 n.2. Moreover, crucially, Plaintiff does not explain how these instances "detrimentally affected" him, much less how they would affect a reasonable person.

Even if Plaintiff could establish the four elements of a hostile work environment, Plaintiff still has not met his burden under the fifth prong of the hostile work environment framework in establishing a basis for employer liability. Plaintiff seeks to hold Defendant, his former employer, liable for a hostile work environment under the *respondeat superior* theory of liability. First, with respect to the "use the shovel" and "boy" remarks, Plaintiff asserts both of these comments were made by co-workers. To that end, Plaintiff has not shown that Defendant failed to provide a reasonable avenue for complaint or that Defendant knew or should have known of the harassment and failed to take prompt remedial and appropriate remedial action. To the contrary, Plaintiff testified during his deposition that he reported the "boy" remark and Defendant conducted an investigation into the incident but was not able to substantiate Plaintiff's allegation. Plaintiff also testified he believed he reported the "use the shovel" remark but was not able to identify who he reported the incident to. Indeed, from the record before this Court, Plaintiff did have an avenue for

complaint for these remarks. Moreover, Plaintiff does not point to evidence in the record demonstrating that Defendant knew or should have known of the remarks and failed to take appropriate remedial action.

In connection with the offensive materials posted in the locker room, it is unclear from the record whether a supervisor or co-worker posted the offensive materials identified by Plaintiff in the employee locker room, which is a necessary factor for the Court to consider Defendant's liability under *respondeat superior*. Even if a supervisor was involved in posting the offensive materials in the employee locker room, Plaintiff does not point to any evidence in the record demonstrating that the posting of offensive materials resulted in a significant change in his employment status. Thus, even if a non-supervisory co-worker was responsible for posting the materials, Plaintiff has not shown that Defendant failed to provide an avenue for complaint or knew or should have known of the material and failed to take prompt action. Rather, Plaintiff testified that when he complained about the material in the employee locker room, the material was removed and not reposted.

Accordingly, because the evidence in the record as a whole does not satisfy the elements of a hostile work environment, the Court grants summary judgment on this claim.

### 2. Discrimination and Retaliation

As an initial matter, claims of discrimination and retaliation under Title VII are subject to the *McDonnell Douglas* burden-shifting framework. *See Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003) (applying *McDonnell Douglas* to discrimination claims); *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006) (acknowledging application of *McDonnell Douglas* to retaliation claim). Under the three-step burden shifting framework, the plaintiff must first establish

a *prima facie* case of discrimination or retaliation. *Rhoden v. Childs. Hosp. of Pittsburgh of UPMC Health Sys.*, 749 F. App'x 86, 88 (3d Cir. 2018). If a *prima facie* case for discrimination or retaliation is established, the burden of proof shifts to the employer to present a legitimate, non-discriminatory or non-retaliatory reason for its action or decision. *Parker v. Sec'y U.S. Dep't of Veterans Affs.*, 676 F. App'x 101, 104 (3d Cir. 2017) (citing *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015)); *see also Shaner v. Synthes*, 204 F.3d 494, 500-01 (3d Cir. 2000). The employer "satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a non[-]discriminatory [or non-retaliatory] reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination [or retaliation] always rests with the plaintiff." *Id*.

If such a legitimate, non-discriminatory or non-retaliatory reason is offered, the burden shifts back to the plaintiff to demonstrate "by a preponderance of the evidence that the employer's proffered reason is pretextual." *Anderson v. Boeing Co.*, 694 F. App'x 84, 86 (3d Cir. 2017). In other words, the plaintiff must show that the reasons offered by the employer were false and that discrimination or retaliation was the "real reason" for the adverse employment action. *Young v. City of Phila. Police Dep't*, 651 F. App'x 90, 95 (3d Cir. 2016); *Moore*, 461 F.3d at 341. To make a showing of pretext, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory [or retaliatory] reason was more likely than not a motivating or determinative cause of the employer's action." *Burton v. Teleflex, Inc.*, 707 F.3d 417, 427 (3d Cir. 2013) (quoting *Fuentes*, 32 F.3d at 764). If the plaintiff's evidence relates

to the credibility of the employer's proffered justification, the plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Id.* (quoting *Fuentes*, 32 F.3d at 765). If each party meets its burden at each stage, summary judgment is inappropriate. *Whishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007). However, summary judgment may be appropriate if a party fails to meet its burden under this framework. *Dellapenna v. Tredyffrin/Easttown Sch. Dist.*, 449 F. App'x 209, 215-16 (3d Cir. 2011).

### a. Discrimination

To state a *prima facie* case of employment discrimination based on race, a plaintiff must show he or she: (1) is a member of a protected class; (2) is qualified for the position he or she held; (3) suffered an adverse employment action; and (4) the circumstances of the adverse employment action give rise to an inference of discrimination, such as might occur when a plaintiff shows he or she was treated less favorably than a similarly situated employee of a different race. *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410-11 (3d Cir. 1999); *Penn v. ExxonMobil Research & Eng'g Co.*, No. 17-3140, 2019 WL 4745253, at *4-5 (D.N.J. Sept. 30, 2019). As stated previously, an adverse or tangible employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Barnett v. N.J. Transit Corp.*, 573 F. App'x 239, 244 (3d Cir. 2014) (quoting *Burlington Indus.*, 524 U.S. at 761); *see Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004) (describing an adverse employment action "as an action by an employer that is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment'" (quoting *Cardenas*, 269 F.3d at 263)).

There is no dispute that Plaintiff satisfies the first three elements of a *prima facie* case for discrimination: 1) Plaintiff, as an African American, is a member of a protected class, 2) Plaintiff was qualified for his position, and 3) Plaintiff experienced an adverse employment action. The only dispute is whether the circumstances of Plaintiff's termination give rise to an inference of discrimination.

To establish circumstances of the adverse employment action giving rise to an inference of discrimination, a plaintiff may: "(1) introduce evidence of comparators (i.e., similarly situated employees who (a) were not members of the same protected class and (b) were treated more favorably under similar circumstances); or (2) rely on circumstantial evidence that otherwise shows a causal nexus between his [or her] membership in a protected class and the adverse employment action." *Greene v. V.I. Water & Power Auth.*, 557 F. App'x 189, 195 (3d Cir. 2014). An inference of discrimination could also be supported with "evidence of similar racial discrimination of other employees, or direct evidence of discrimination from statements or actions by [the employee's] supervisors suggesting racial animus." *Golod v. Bank of Am. Corp.*, 403 F. App'x 699, 702 n.2 (3d Cir. 2010).

In this case, Plaintiff does not point to any evidence in the record demonstrating circumstances of the adverse employment action giving rise to an inference of discrimination. During his deposition, when asked to identify discriminatory actions taken against him or whether he believed any particular adverse action was based on his race, Plaintiff responded "yes" to the questions but then only referred to the Fennimore incident as the alleged underlying motivation for discrimination.  Plaintiff may not rely on conclusory statements about discrimination which are devoid of specific facts. *See, e.g., West v. Hudson Cnty. Corr. Ctr.*, 231 F. App'x 136, 139 (3d Cir. 2007) (upholding district court's grant of summary judgment on discrimination claim when

plaintiff's affidavit set forth "merely general, conclusory statements about discrimination, devoid of specific facts").

Simply stated, even when given the opportunity during his deposition, Plaintiff did not point to any facts from which an inference of discrimination can be made. Notably, although Plaintiff testifies about his assignment to janitorial duties, he does not address the fact that safety complaints were reported to management regarding his work behavior, including his "confrontational" behavior, not performing his job as instructed by his supervisors, and questioning directives given to him as the incidents that led up to his reassignment to janitorial duties. Plaintiff also does not address the fact that his reassignment to janitorial duties was temporary, and that he returned to normal work assignments following investigations into the safety complaints. Plaintiff offers no evidence, other than his own self-serving speculation, to show that he was assigned to janitorial tasks due to his race. *See, e.g., Atkinson v. N. Jersey Developmental*, 453 F. App'x 262, 266 (3d Cir. 2011) (affirming district court's finding that plaintiff had not established *prima facie* case of discrimination after, in part, recognizing plaintiff's allegations as self-serving). For example, Plaintiff did not submit any evidence, either testimonial or documentary, demonstrating either similarly situated employees who were not African American received safety complaints but were not temporarily assigned to janitorial duties or evidence demonstrating a causal connection between his status as an African American and his temporary janitorial reassignment. In fact, amidst safety concerns, a fair reading of the record leads to the conclusion that this temporary assignment enabled Plaintiff to continue to work during a pending investigation into safety complaints.

Plaintiff also testified about the actions of two employees, Meyers and Horvath, who engaged in what, according to Plaintiff, appears to be prohibited conduct – putting a hole in a gas

23

line and driving a particular truck unlicensed. According to Plaintiff, Meyers and Horvath were treated more favorably by Defendant because they were not disciplined or reported. First, "to be considered similarly situated, comparator employees must be similarly situated in all relevant respects." *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 882 (3d Cir. 2011). In determining whether someone can be considered similarly situated, "courts tend to consider whether the plaintiff and the comparator had similar job responsibilities, were subject to the same standards, worked for the same supervisors, and engaged in comparable misconduct." *Ewell v. NBA Properties, Inc.*, 94 F. Supp. 3d 612, 624 (D.N.J. 2015). "[W]hether similarly situated nonmembers of a protected class were treated more favorably than a member of the protected class, the focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 647 (3d Cir. 1998). To be similarly situated means "showing that the employees . . . engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 223 (3d Cir. 2009).

Accordingly, only employees who engaged in comparable misconduct that warranted Plaintiff's reassignment to janitorial duties should be considered in the Court's analysis.[21] To that end, neither of the employees Plaintiff has attempted to identify as comparators could serve as similarly situated nonmembers of Plaintiff's protected class. Neither Meyers nor Horvath engaged in conduct comparable to Plaintiff. Plaintiff was cited for safety violations after being confrontational, not performing his job as instructed by his superiors, and questioning directives given to him. Plaintiff does not assert that Meyers or Horvath engaged in this type of conduct.

---

[21] While the record identifies Meyers as Caucasian, it is unclear whether Horvath is Caucasian or otherwise not a member of the same protected class as Plaintiff. In viewing the evidence in the light most favorable to Plaintiff, the Court proceeds with its analysis as though Horvath is not a member of the same protected class as Plaintiff.

Moreover, Plaintiff does not provide evidence demonstrating that Meyers or Horvath were utility mechanics like Plaintiff or that they reported to Venito, Plaintiff's supervisor.

As Plaintiff has failed to satisfy his burden of establishing a *prima facie* case of discrimination, the Court need not engage in the *McDonnell Douglas* burden-shifting analysis. Thus, the Court grants summary judgment on Plaintiff's discrimination claim.

### b. Retaliation

Title VII prohibits retaliation against an employee (1) "because he has opposed any practice made an unlawful employment practice [by Title VII]," or (2) "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show that: "(1) [he or] she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against [him or] her; and (3) there was a causal connection between [his or] her participation in the protected activity and the adverse employment action." *Moore*, 461 F.3d at 340-41 (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)). "With respect to 'protected activity,' the anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings . . . and those who oppose discrimination made unlawful by Title VII . . . ." *Id*. Protected activity includes formal charges of discrimination "as well [as] informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990). A plaintiff "need only allege discrimination on the basis of race, color, religion, sex, or national origin to be protected

from retaliatory discharge under Title VII." *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 268 (3d Cir. 2006).

Here, the record before the Court demonstrates that Plaintiff satisfies the first two elements of retaliation as Plaintiff 1) engaged in protected activity in filing a charge of discrimination against Defendant with the NJDCR, and 2) suffered an adverse action after engaging in the protected activity by way of termination. However, Plaintiff has not presented the Court with evidence of a causal connection between his participation in the protected activity and the adverse employment action. "The Supreme Court has clarified that the third element of a Title VII retaliation claim requires but-for causation." *D'Ambrosio v. Crest Haven Nursing & Rehab. Ctr.*, 755 F. App'x 147, 153 (3d Cir. 2018). To satisfy the but-for causation requirement of a retaliation claim, Plaintiff would need to present evidence demonstrating that but-for reporting Defendant to the NJDCR, he would have remained employed. In its termination letter, Defendant identified a number of incidents giving rise to Plaintiff's termination occurring over the span of more than a year: 1) failing to follow instructions; 2) failing to properly install an Adams clamp; and 3) punching a co-worker, aggressively pulling him off a company vehicle, and not being candid in Defendant's related investigation into the incident. Plaintiff has not offered any evidence that casts doubt on the reasons Defendant provided to terminate him or indicate that but-for Plaintiff's reporting of Defendant to the NJDCR, Plaintiff would have remained employed by Defendant.

As a separate basis in support of his retaliation claim, Plaintiff testified that events such as the temporary assignment of janitorial duties, an unscheduled drug test, and being asked to take a fitness for duty examination, all of which occurred after the Fennimore incident when he expressed his disagreement about air testing the gas service on a gas main for fear that it would cause an explosion, were in "retaliation" against him. As a preliminary matter, Plaintiff's disagreement with

a co-worker about proper safety protocol is not protected activity under the anti-retaliation provision of Title VII and is, therefore, inapposite to the retaliation analysis. "To be protected from retaliation under Title VII, the protected activity must relate to employment discrimination charges brought under that statute, implicating 'discrimination on the basis of race, color, religion, sex, or national origin.'" *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 792 n.10 (3d Cir. 2016) (quoting *Slagle*, 435 F.3d at 268). A disagreement about proper safety protocol, the very incident Plaintiff relies on as his basis for the "retaliatory" conduct he experienced after the Fennimore incident, is not "protected activity" under the anti-retaliation provision of Title VII. *See id.* at 792 n.10 (upholding district court's finding that employee's complaints which implicated only safety issues "were not protected activity for purposes of her retaliation claim"). Therefore, to the extent Plaintiff relies on the Fennimore incident as protected activity to support his retaliation claim under Title VII, his retaliation claim fails. As Plaintiff has failed to satisfy his burden of establishing a *prima facie* case of retaliation, the Court need not engage in the *McDonnell Douglas* burden-shifting analysis. Thus, the Court grants summary judgment on Plaintiff's retaliation claim.

## V.    CONCLUSION

For the reasons explained above, Defendant's Motion for Summary Judgment is **GRANTED** and Plaintiff's Motion to Dismiss is **DENIED**. An accompanying Order shall issue.

Dated: May 3, 2024

*Karen M Williams*
_____
KAREN M. WILLIAMS
U.S. DISTRICT JUDGE